[No. H013605. Sixth Dist. Jan. 29, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID SCOTT DEWEY, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.

**COUNSEL**

David D. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Peggy S. Ruffra, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

COTTLE, P. J.—A jury convicted defendant David Scott Dewey of unlawfully taking and driving a 1973 Dodge motor home (Veh. Code, § 10851)[1] and of possessing the methamphetamine found inside the vehicle (Health & Saf. Code, § 11377). In a separate proceeding, the court found true that defendant had served a prior prison term (Pen. Code, § 667.5, subd. (b)). Defendant was sentenced to three years and eight months in state prison.

In the published portion of this opinion, we determine that the trial court properly permitted defendant to be impeached with his prior Vehicle Code section 2800.2 conviction for fleeing a peace officer by driving with the intent to evade "in a willful or wanton disregard for the safety of persons or property." In so doing, we conclude that a violation of Vehicle Code section 2800.2 is a crime of moral turpitude as defined in *People* v. *Castro* (1985) 38 Cal.3d 301, 314 [211 Cal.Rptr. 719, 696 P.2d 111]. In the unpublished portion of the opinion, we address defendant's claim that the trial court erred by denying his request for a mistrial based upon prosecutorial misconduct.

### I. *Facts*

On September 26, 1994, Sergeant Bryant approached defendant and his wife in the wildlife refuge in Marina as they tried to park a Dodge motor home and another car after closing hours. The motor home had no front license plate and its rear plate had no registration tabs. Defendant claimed he had lost the rear plate and had replaced it with the front plate, and a records check later revealed that the license plate on the Dodge motor home did belong to defendant. When Bryant said he was going to run a warrant check, defendant ran away. Defendant's wife then indicated the vehicles belonged to her and agreed to remove them from the refuge.

The next day, Bryant looked for defendant at Twin Bridges Trailer Park near the refuge. There he found an Angeles motor home which was similar to the Dodge motor home seen in the refuge the day before. The Angeles motor home had no license plates or vehicle identification number (VIN).

---

[1]The jury found defendant not guilty of the alternative charge of receiving stolen property (Pen. Code, § 496, subd. (a)).

Two days later, Sharon Bohrman reported that her 1973 Dodge Sportsman motor home had been stolen. Her husband parked it near the Monterey Airport on September 18, 1994; he discovered it missing when he returned 10 days later.

On October 7, 1994, James Ruiz reported a domestic dispute at an Exxon station near Prunedale. He directed the deputies who responded to a Dodge motor home which was disabled and had been abandoned after an apparent domestic dispute. A check of the VIN revealed the motor home was the one stolen from the Bohrmans. However, the VIN did not match the license number, which was registered to defendant. During their search of the Dodge motor home, the deputies found several items of identification belonging to defendant, including a registration slip for the Angeles motor home bearing defendant's name. They found a fanny pack containing a bindle (1.7 grams) of methamphetamine and a five-page description of how to manufacture methamphetamine in a bag containing personal papers belonging to defendant and the Bohrmans.

Later that morning, Sergeant Bryant saw the Angeles motor home parked off Highway 101; now, it bore the license plate Bryant had seen on the stolen Dodge motor home on September 26, 1994. Defendant was located a few minutes later and arrested.

Kenneth Bohrman testified that when his Dodge motor home was returned, it was "a mess compared to when [he] got it," that there was damage to the wood molding in several places, cupboard doors were broken and hanging, and there was an acrid odor of urine throughout the motor home. He added that his insurance company "totaled it out" and gave him a settlement.

Defendant testified on his own behalf. He denied knowing the Dodge motor home was stolen. He said he purchased it from a man claiming to be Kenneth Bohrman and gave this man $1,000 as a down payment in return for a receipt and a release of liability. He claimed he put the receipt and release in the glove compartment of the Dodge motor home but conceded that, assuming they were not found in the paperwork in the vehicle, he did not know where they were. Defendant said he was to receive official documentation for the vehicle when he paid an additional $1,000 to complete the sale.

Defendant indicated he bought the Dodge motor home to fix it up for resale. He claimed his mechanic put the license plate from the Angeles motor home on the Dodge motor home so he and the mechanic could test-drive it. He provided his mechanic's name but indicated he was a "backyard mechanic" who worked on cars at Twin Bridges but did not live there.

Defendant drove the Dodge motor home to the Exxon station in Prunedale where it broke down. According to defendant, his mechanic then drove him to his Angeles motor home, which he used to return to Prunedale to retrieve tools he had left in the Dodge motor home. He said he got into an argument there with a man named John Holmes, and this argument prompted Ruiz to call police; defendant denied having a domestic dispute with his wife.

Defendant testified he had been walking on Highway 101 at 7 a.m. on October 7, 1994, because his Angeles motor home had had mechanical problems after he left Prunedale.

When asked why he ran from Sergeant Bryant on September 26, 1994, defendant said, "I thought . . . I had a warrant out."

Defendant admitted his prior conviction for a violation of Vehicle Code section 2800.2.

## II.  *Impeachment*

█ Over objection, the trial court held that defendant's prior conviction for Vehicle Code section 2800.2[2] "will be allowed to come in for purposes of impeaching the defendant if he should take the stand . . . ." For the reasons stated below, we conclude this ruling was proper.

█ The California Constitution states that "[a]ny prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding." (Cal. Const., art. I, § 28, subd. (f).) Our Supreme Court has interpreted this to mean that "any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty," may be used to impeach a witness in a criminal proceeding "subject to the trial court's discretion under [Evidence Code] section 352 . . . ." (*People* v. *Castro, supra,* 38 Cal.3d at p. 306.) In *Castro,* the court defined "moral turpitude" as a " 'general readiness to do evil' " (*id.,* at p. 314); approximately 50 years earlier, the court had commented that "[m]oral turpitude has been defined by many authorities as an act of baseness, vileness or depravity in the private and social duties which a man owes his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man. [Citation.]" (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442].)

Section 2800.2 provides, in pertinent part, that "[i]f a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and

---

[2]All further statutory references are the Vehicle Code unless otherwise specified.

the pursued vehicle is driven in willful or wanton disregard for the safety of persons or property, the person driving the vehicle, upon conviction, shall be punished by imprisonment in the state prison, by imprisonment in the county jail for not more than one year, or by a fine . . . ."

Section 2800.1 provides, in pertinent part, that "[a]ny person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor if all of the following conditions exist: [¶] (1) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp. [¶] (2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary. [¶] (3) The peace officer's motor vehicle is distinctively marked. [¶] (4) The peace officer's motor vehicle is operated by a peace officer . . . and that peace officer is wearing a distinctive uniform."

■ The justification for allowing a witness to be impeached with a prior felony conviction involving moral turpitude is that such convictions relate to the witness's veracity and support an inference that he or she may lie under oath. (*People* v. *Castro, supra,* 38 Cal.3d at p. 316.) The court in *Castro* did not attempt to list all felonies involving moral turpitude; it recognized that trial courts will have to make such a determination "with respect to each felony conviction offered for impeachment." (*Ibid.*)

In making such a determination, courts are limited to the "least adjudicated elements of the conviction . . . ." (*People* v. *Castro, supra,* 38 Cal.3d at p. 317.) The test is whether, " 'from the elements of the offense alone . . . one can reasonably infer the presence of moral turpitude.' [Citation.]" (*People* v. *Campbell* (1994) 23 Cal.App.4th 1488, 1492 [28 Cal.Rptr.2d 716], italics omitted.) Therefore, a court cannot "go behind the fact of the conviction and receive evidence on the underlying facts." (*People* v. *Castro, supra,* 38 Cal.3d at p. 316.) ■ Here, we agree with the People that "[a] review of the language of [section 2800.2] and of the case law shows that a violation of . . . section 2800.2 evinces a general readiness to do evil."

Section 2800.2 makes it a crime to flee or attempt to elude a pursuing peace officer by driving "in a willful or wanton disregard for the safety of persons or property." "Wantonness" is defined as having "consciousness of conduct, intent to do or omit the act in question, realization of the probable injury to another, and reckless disregard of the consequences." (CALJIC No. 16.840 [Reckless Driving].) In the context of reckless driving, the term "willful" refers to the intentional disregard for safety. (*People* v. *Schumacher* (1961) 194 Cal.App.2d 335, 340 [14 Cal.Rptr. 924].) A person convicted of

section 2800.2 must also necessarily violate section 2800.1, which requires an "intent to evade" the "pursuing officer's motor vehicle."

In holding that escape or attempted escape without force or violence (Pen. Code, § 4532, subd. (b)) is a crime of moral turpitude, the court in *People* v. *Waldecker* (1987) 195 Cal.App.3d 1152, 1157 [241 Cal.Rptr. 650], analogized section 4532, subdivision (b) to burglary, in that both involve inherent dangers to personal safety created by the usual offense. It noted that escape without violence necessarily involves either deceit or stealth and thus creates an obvious potential for violence because prison officials have a duty to thwart escape and apprehend escapees. (195 Cal.App.3d at p. 1158.) In validating the use of such a conviction for impeachment purposes, the court reasoned that "[a] defendant who was willing to expose himself and others to the potential for physical harm, to employ stealth, or to violate a trust in order to effectuate an escape may be equally [well] motivated and prepared to violate a testimonial oath in order to escape conviction." (*Ibid.*)

Similarly, a defendant consciously places the safety of others in jeopardy when driving with the intent to evade a pursuing officer and with a willful or wanton disregard for the safety of persons or property while fleeing from a pursuing officer. Recognizing that "fleeing from police in wanton disregard of others carries with it as a likely consequence the possibility of massive physical harm," the court in *People* v. *Johnson* (1993) 15 Cal.App.4th 169, 174 [18 Cal.Rptr.2d 650], held that a violation of section 2800.2 is an inherently dangerous felony that will support a conviction for second degree murder. In so holding, the court noted that the offense creates the obvious potential of great bodily harm to pedestrians, other drivers, and pursuing officers. (15 Cal.App.4th at p. 174.)

Furthermore, the fact that a violation of section 2800.2 always involves an "intent to evade" the pursuing officer provides additional justification for concluding that the offense constitutes a crime of moral turpitude. A person seeking to evade criminal prosecution by leaving the scene of an accident without stopping commits a crime of moral turpitude. (*People* v. *Bautista* (1990) 217 Cal.App.3d 1, 7 [265 Cal.Rptr. 661].) Similarly, here, a person who is willing to risk the potential of harm to persons and property of others in order to evade a pursuing peace officer "may be equally motivated and prepared to violate a testimonial oath in order to escape conviction." (*People* v. *Waldecker, supra,* 195 Cal.App.3d at p. 1158.) We are convinced section 2800.2 is a crime of moral turpitude as that term is defined in *Castro*.

In so holding, we reject defendant's contention that because "the least adjudicated aspect of . . . section 2800.2 is an endangerment to property"

(capitalization omitted), the offense cannot involve moral turpitude. To illustrate this argument, defendant contends the offense could include "endangering a beat up mailbox." However, ". . . the ability to imagine a set of circumstances under which a penal statute can be violated without moral fault cannot be the measure of the moral turpitude that is involved in violating that statute. If that is what is required by the least adjudicated elements test, no crime would ever involve moral turpitude." (*People* v. *Thomas* (1988) 206 Cal.App.3d 689, 698 [254 Cal.Rptr. 15].) In rejecting defendant's argument in the context of whether section 2800.2 constitutes an inherently dangerous felony, the court in *Johnson* held that "giving the statutory language involving 'wanton disregard' for the safety of 'persons or property' a commonsense construction, it appears [that] the 'wanton disregard' in question is total, rather than selective. That is, the disregard is for everything, whether living or inanimate" and that "[i]n even the most ethereal of abstractions, it is not possible to imagine that the 'wanton disregard' of the person fleeing does not encompass disregard for the safety of the pursuing officers." (*People* v. *Johnson*, *supra*, 15 Cal.App.4th at p. 174.) We therefore are unpersuaded by defendant's claim that the least adjudicated element of his conviction is "simply endangering property."

In summary, we conclude that defendant's felony conviction for driving with the intent to evade pursuing peace officers in willful or wanton disregard for the safety of persons or property (§ 2800.2) is a crime involving moral turpitude and that the trial court did not abuse its discretion in permitting the use of that prior conviction for impeachment purposes. (*People* v. *Castro*, *supra*, 38 Cal.3d at p. 306-307.)

### III. *Motion for Mistrial Based Upon Prosecutorial Misconduct**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

### IV. *Disposition*

The judgment is affirmed.

Bamattre-Manoukian, J., and Wunderlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 17, 1996.

---

*See footnote, *ante*, page 216.